# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

**FLORENTINO FRANCO SANCHEZ,**

    **Plaintiff,**

    **v.**                                         **Case No. 21-CV-1442-SCD**

**KILOLO KIJAKAZI,**
  *Acting Commissioner of the Social Security Administration,*

    **Defendant.**

---

## DECISION AND ORDER

---

      Florentino Franco Sanchez applied for social security disability benefits based primarily on depression and anxiety. The Commissioner of the Social Security Administration denied the application, and, after a hearing, an administrative law judge found Franco Sanchez not disabled under the Social Security Act. Franco Sanchez seeks judicial review of that decision, arguing that the ALJ erred in evaluating the medical opinion evidence and in assessing the intensity and persistence of his alleged symptoms. I agree that the ALJ erred in evaluating the treating providers' opinions. Moreover, because the treating providers' opinions and the vocational expert's testimony together show that Franco Sanchez is disabled, I will reverse the ALJ's decision and remand the matter to the Commissioner with instructions to award Franco Sanchez benefits.

## BACKGROUND

      In 2020, Franco Sanchez applied for disability insurance benefits under Title II of the Social Security Act, claiming that he became disabled and unable to work in 2019 due to depression, anxiety, and pain in his leg, arm, and neck.

## I.    Medical Background

Franco Sanchez was born in Mexico in 1967. R. 40–41, 363.[1] He claims to have been depressed and anxious since childhood. R. 255, 364. He graduated high school and later came to the United States, becoming a naturalized citizen in 1996. *See* R. 192, 363, 408–09. Franco Sanchez worked for years as a medical assistant for Milwaukee County, first with the parks department and later at the jail. *See* R. 42–43, 218, 232. Working at the jail significantly increased his anxiety, as inmates threatened him, and he was named as a defendant in several lawsuits. *See* R. 250, 253–55, 375, 405. In 2008, Franco Sanchez went to the emergency room with suicidal thoughts and severe depression and anxiety. *See* R. 254–55, 364. He started seeing a psychiatrist for medication and took several months off from work, but the work-related stress did not relent, and he eventually quit. *See* R. 7, 254–55, 363–64. However, after years of study, he finally obtained a bachelor's degree. *See* R. 41, 231, 363.

Franco Sanchez got a new job working as a phlebotomist at a hospital; it didn't go well. *See* R. 7, 49, 218, 232, 249. He couldn't keep up with the work pace, was making errors on the job, was exhausted after each day of work, had difficulty concentrating, struggled to prioritize tasks, had a hard time following simple directions, was anxious, would shake and sweat, and was fearful of making mistakes. R. 45, 249, 255. Franco Sanchez exhausted his sick leave to deal with his anxiety and depression and took a leave of absence for several months. The hospital terminated his employment in March 2019 after he was unable to return to work. *See* R. 43–44, 230–31, 253, 255–57. He hasn't worked since then. *See* R. 363.

In the meantime, Franco Sanchez continued to receive psychiatric care. He started treatment at American Behavioral Clinics in 2018, seeing Jay Winston, DO, for psychiatry

---

[1] The transcript is filed on the docket at ECF No. 10-1.

and Steven J. Braam, PhD, and Michael Bortin, LPC, for therapy. *See* R. 234, 333–60, 363, 374–79, 381–93, 397–406, 443–51. During his appointments, Franco Sanchez regularly exhibited a depressed and anxious mood and affect. At times he also had impaired attention and concentration and marginal judgment and insight. However, during most mental status examinations, Franco Sanchez was fully oriented, with a groomed appearance, good eye contact, normal motor activity, friendly and cooperative behavior, clear speech, no language problems, no memory problems, good insight, coherent thought flow, no problems of thought content, and no hallucinations or delusions. The providers diagnosed major depressive disorder and anxiety and prescribed various medications. Dr. Braam believed that Franco Sanchez may also have a bipolar disorder, given how quickly his mood fluctuated.

In January 2020, Dr. Winston completed a Metal Impairment Medical Source Statement in support of Franco Sanchez's disability application. *See* R. 323–27. Dr. Winston opined that Franco Sanchez would need to lie down for three or more hours during the day due to fatigue or related symptoms, would be absent from work more than four days a month for treatment or bad days with symptoms, would need six or more unscheduled breaks throughout the workday due to his symptoms, would be off task more than thirty percent of the workday, would be less than fifty percent as efficient as an average worker, and would not be able to perform detailed work tasks. R. 323–25. Dr. Winston also opined that Franco Sanchez had a marked limitation in each of the four areas of mental functioning used in a work setting: understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace; and adapting or managing oneself.[2] R. 325–

---

[2] These four areas of mental functioning are known as the "paragraph B" criteria. The Social Security Administration measures the paragraph B criteria on a five-point scale: none, mild, moderate, marked, and extreme. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(F)(2).

3

26. Finally, Dr. Winston indicated that Franco Sanchez's medications caused drowsiness and sedation. R. 327.

In September 2020, Franco Sanchez saw Mark Pushkash, PhD, for a consultative psychological exam. *See* R. 363–67. Dr. Pushkash noted in his report that Franco Sanchez was neatly groomed and dressed; maintained adequate eye contact and normal social responsiveness; was polite, friendly, and cooperative; had coherent and relevant speech; and displayed no signs of delusion thinking or paranoia. R. 364. However, he also noted that Franco Sanchez exhibited a depressed affect and an anxious mood and struggled with several of the mental aptitude tests. R. 364–65. Dr. Pushkash diagnosed major depressive disorder and generalized anxiety order. R. 365.

Dr. Pushkash concluded the report by providing an opinion about Franco Sanchez's capacity for work functions. According to Dr. Pushkash, Franco Sanchez had the intellectual capabilities to comprehend, recall, and follow through on instructions. R. 365. However, Dr. Pushkash opined that Franco Sanchez's ability to concentrate and persist on tasks in a work environment would be severely impaired due to the interfering effects of anxiety and depression. Dr. Pushkash further opined that Franco Sanchez likely would have difficulties relating appropriately to supervisors and coworkers because of his withdrawal and lack of energy. Dr. Pushkash noted that his opined limitations persisted despite medication and counseling.

In November 2020, Bortin, the psychotherapist, completed a form in support of Franco Sanchez's disability application. *See* R. 368–72. Bortin issued the same opinions as Dr. Winston concerning Franco Sanchez needing to lie down during the workday; missing work; needing unscheduled breaks; having impaired attention, concentration, pace, and

4

persistence; struggling with completing tasks; having marked limitations in each of the four paragraph B criteria; and experiencing side effects from his medications. R. 368–72. Bortin also opined that Franco Sanchez would have verbal outbursts of anger several times a week or more often and would need an unusual level of supervision several times a day. R. 368, 370.

In April 2021, Franco Sanchez was hospitalized for four days after he presented to the emergency department for suicidal thoughts and worsening anxiety and depression. *See* R. 407–24. Franco Sanchez complained at the time of admission about lack of sleep, poor appetite, and difficulty concentrating. R. 407. During a mental status examination, he exhibited anxious psychomotor activity, depressed mood, and anxious affect. R. 409. However, he was also neatly groomed; received the examiner well; had fluent speech; did not show any signs of psychosis or mania; had logical thought process and associations; did not have impaired insight or judgment; was alert; did not exhibit any memory deficits; had good attention, concentration, and fund of knowledge; was fully oriented; and stood and ambulated without difficulty. Providers made changes to his medications and noted at discharge that his suicidal ideations had resolved and that he was ready to go home. R. 411.

Franco Sanchez has also complained at times about physical impairments, including pain in his chest, knee, arms, and neck. *See* R. 364, 416–40. However, physical examinations have consistently been unremarkable, with full range of motion and normal sensation, cranial nerves, motor strength, gait, and reflexes.

## II.    Procedural Background

In March 2020, Franco Sanchez applied for disability insurance benefits from the Social Security Administration. *See* R. 15, 187–90, 229–35. He alleged disability beginning on

his last day of work—March 4, 2019—due to major depressive disorder, anxiety disorder, and pain in his leg, arm, and neck. Franco Sanchez asserted that his impairments significantly affected his ability to remember, complete tasks, concentrate, understand, and follow directions. *See* R. 240–55. He also asserted significant limitations in his daily activities. He described bad days during which he spent most of his time in bed. Franco Sanchez reported that, on good days, he was able to go grocery shopping, groom himself, talk to his neighbor, and make simple meals, though not all on the same day. Also, he asserted that his medications caused difficulty sleeping at night.

The state agency charged with reviewing the application on behalf of the Social Security Administration denied the claim initially and upon Franco Sanchez's request for reconsideration. *See* R. 61–93. The physicians who reviewed the medical records found that Franco Sanchez did not have any physical medically determinable impairments. R. 65, 80–81. The reviewing psychologists found that Franco Sanchez had severe, but not disabling, depression and anxiety. R. 65–66, 68–70, 81–83, 85–89. Specifically, they found that Franco Sanchez had a moderate limitation in each of the four paragraph B criteria.

After the state-agency denial, an ALJ employed by the Social Security Administration held an evidentiary hearing on Franco Sanchez's application. *See* R. 35–57. Franco Sanchez testified at the hearing. *See* R. 40–49. He told the ALJ that he had to leave his job at the hospital due to worsening depression and anxiety. R. 49. He was making a lot of mistakes, struggling with anxiety, worrying too much, not comprehending what he was reading, and unable to follow instructions. R. 45. He stated that his medications helped "a little bit," that he would be in bad shape without his medications, and that his medications made him feel dizzy. R. 45–46.

Franco Sanchez also testified about his daily activities. He reported spending most of the day in bed or on the couch. R. 46. He said he did laundry once a month, showered two or three times a week, often forgot to brush his teeth, went for a short walk two times a week (when he had the energy), and went to the gym once or twice a month (again, when he felt up to it). R. 46–48. Franco Sanchez stated that he liked to garden and watch comedies, but he lost interest in most activities and struggled comprehending movies. He also reported difficulty being around other people, though he did spend time with one of his neighbors. R. 48.

A vocational expert also testified at the hearing. *See* R. 50–56. The vocational expert testified that a hypothetical person with Franco Sanchez's vocational profile (i.e., fifty-one years old on the alleged disability onset date, a college education, and experience as a medical assistant and phlebotomist) could work as a marker, a cleaner (housekeeping), and a dining room attendant if he were limited to a restricted range of unskilled work. R. 50–53. According to the vocational expert, no jobs would be available if the person needed unscheduled breaks throughout the workday, was absent from work more than once a month, was off task more than ten percent of the workday, required an unusual level of supervision, had a verbal outburst at a supervisor or coworker, or needed to lie down outside of normal breaks. R. 53–56.

In July 2021, the ALJ issued a written decision finding that Franco Sanchez was not disabled. *See* R. 12–34. The ALJ considered the disability application under 20 C.F.R. § 404.1520(a)(4), which sets forth a five-step process for evaluating disability benefits claims. At step one, the ALJ determined that Franco Sanchez had not engaged in substantial gainful activity since his alleged onset date (March 4, 2019). R. 17. The ALJ determined at step two

7

that Franco Sanchez had three severe impairments: affective disorder, depression, and anxiety. R. 17–18. At step three, the ALJ determined that Franco Sanchez did not have an impairment, or a combination of impairments, that met or medically equaled the severity of a presumptively disabling impairment listed in the social security regulations, 20 C.F.R. Part 404, Subpart P, Appendix 1 (i.e., "the listings"). R. 18–19. The ALJ explicitly considered Listings 12.04 (depression) and 12.06 (anxiety) but found that Franco Sanchez had only a moderate limitation in each of the paragraph B criteria.

The ALJ next assessed Franco Sanchez's residual functional capacity—that is, his maximum capabilities despite his limitations, *see* 20 C.F.R. § 404.1545(a). The ALJ determined that Sanchez could work at all exertional levels but with several non-exertional limitations. R. 19–20. Specifically, the ALJ found Franco Sanchez capable of performing unskilled jobs that involve routine job tasks and instructions; maintaining attention, concentration, persistence, and pace for simple and repetitive tasks for two hours at a time over the workday; performing jobs having only occasional decision-making and changes in work setting; and having only occasional interaction with the public, coworkers, and supervisors.

In assessing that RFC, the ALJ considered Franco Sanchez's subjective allegations about his impairments, the medical evidence, the prior administrative medical findings, and the medical opinion evidence. *See* R. 20–28. The ALJ determined that Franco Sanchez's medically determinable impairments could reasonably be expected to cause his alleged symptoms. R. 22. However, according to the ALJ, Franco Sanchez's statements concerning the intensity, persistence, and limiting effects of his symptoms were not consistent with the medical evidence and other evidence in the record. The ALJ concluded that Franco Sanchez

8

consistently demonstrated good function on examination despite longstanding symptoms. R. 22–24. The ALJ also concluded that Franco Sanchez's symptoms improved when taking medication. R. 24. As for the opinion evidence, the ALJ found the prior administrative medical findings of the reviewing state-agency psychologists persuasive concerning the paragraph B criteria. R. 24–25. The ALJ found unpersuasive the opinions of Dr. Pushkash (the consultative psychological examiner), Dr. Winston (psychiatrist), and Bortin (therapist). R. 25–27.

The ALJ then continued with the sequential evaluation process. At step four, the ALJ determined that Franco Sanchez could not perform his past jobs as a phlebotomist and a medical assistant. R. 28. The ALJ determined at step five that there were jobs that existed in significant numbers in the national economy that Franco Sanchez could perform. R. 28–29. Relying on the vocational expert's testimony, the ALJ mentioned three examples: marker, cleaner/housekeeping, and dining room attendant.

Based on those findings, the ALJ determined that Franco Sanchez was not disabled from his alleged onset date through the date of the decision. R. 29–30.

The Appeals Council denied Franco Sanchez's request for review, *see* R. 1–6, making the ALJ's decision a final decision of the Commissioner of the Social Security Administration, *see Loveless v. Colvin*, 810 F.3d 502, 506 (7th Cir. 2016).

In December 2021, Franco Sanchez filed this action seeking judicial review of the Commissioner's decision denying his claim for disability benefits under the Social Security Act, 42 U.S.C. § 405(g). *See* ECF No. 1. The matter was reassigned to me after all parties consented to magistrate-judge jurisdiction under 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73(b). *See* ECF Nos. 3, 5, 6. Franco Sanchez filed a brief in support of his disability claim, ECF No.

9

11; Kilolo Kijakazi, Acting Commissioner of the Social Security Administration, filed a brief in support of the ALJ's decision, ECF No. 15; and Franco Sanchez filed a reply brief, ECF No. 16.

## APPLICABLE LEGAL STANDARDS

"Judicial review of Administration decisions under the Social Security Act is governed by 42 U.S.C. § 405(g)." *Allord v. Astrue*, 631 F.3d 411, 415 (7th Cir. 2011) (citing *Jones v. Astrue*, 623 F.3d 1155, 1160 (7th Cir. 2010)). Pursuant to sentence four of § 405(g), federal courts have the power to affirm, reverse, or modify the Commissioner's decision, with or without remanding the matter for a rehearing. A reviewing court will reverse the Commissioner's decision "only if the ALJ based the denial of benefits on incorrect legal standards or less than substantial evidence." *Martin v. Saul*, 950 F.3d 369, 373 (7th Cir. 2020) (citing *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000)).

"Substantial evidence is not a demanding requirement. It means 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Martin*, 950 F.3d at 373 (quoting *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019)). "When reviewing the record, this court may not re-weigh the evidence or substitute its judgment for that of the ALJ." *Skarbek v. Barnhart*, 390 F.3d 500, 503 (7th Cir. 2004) (citing *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003)). Rather, I must determine whether the ALJ built an "accurate and logical bridge between the evidence and the result to afford the claimant meaningful judicial review of the administrative findings." *Beardsley v. Colvin*, 758 F.3d 834, 837 (7th Cir. 2014) (citing *Blakes v. Barnhart*, 331 F.3d 565, 569 (7th Cir. 2003); *Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001)).

# DISCUSSION

Franco Sanchez first contends that the ALJ erred in evaluating the medial opinion evidence. Because Franco Sanchez applied for disability benefits on or after March 27, 2017, the ALJ applied the new social security regulations for evaluating medical opinions. *See* R. 20 (citing 20 C.F.R. § 404.1520c). Under the new regulations, the ALJ may not "defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s)." 20 C.F.R. § 404.1520c(a). Rather, the ALJ must consider the persuasiveness of all medical opinions in the record using five factors: supportability, consistency, relationship with the claimant, specialization, and other factors that tend to support or contradict a medical opinion. *See* 20 C.F.R. § 404.1520c(c).

Although an ALJ may consider all five factors, "the most important factors" are supportability and consistency. 20 C.F.R. § 404.1520c(a), (b)(2). The supportability factor focuses on what the source brought forth to support his findings: "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) . . . , the more persuasive the medical opinions . . . will be." 20 C.F.R. § 404.1520c(c)(1). The consistency factor, on the other hand, compares the source's findings to evidence from other sources: "[t]he more consistent a medical opinion(s) . . . is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) . . . will be." 20 C.F.R. § 404.1520c(c)(2). The ALJ must explain in his decision how he considered the supportability and consistency factors for each medical opinion in the record. § 404.1520c(b)(2). The ALJ may, but doesn't need to, explain how he considered the other three factors. *Id.*

11

Franco Sanchez maintains the ALJ erred in evaluating the medical opinions of Dr. Winston (his psychiatrist) and Bortin (his psychotherapist). Both opined that Franco Sanchez had marked limitations in each of the four paragraph B criteria. They also opined that Franco Sanchez would need to frequently lie down throughout the workday, would miss a lot of work, would need multiple unscheduled breaks each day, would often be off task, would be significantly less efficient than the average worker, and would not be able to perform detailed work tasks. Additionally, Bortin opined that the plaintiff would likely have verbal outbursts of anger at least several times a week and would require an unusual level of supervision several times a day. The vocational expert testified that each of those opined limitations, if adopted, would preclude all competitive work.

The ALJ determined that the opinions of Dr. Winston and Bortin were unpersuasive because they were inconsistent with the medical evidence of record, mainly Dr. Winston's own treatment notes. *See* R. 26–27. The ALJ first concluded that the medical evidence did not support a finding of a marked limitation in any of the paragraph B criteria. In reaching that conclusion, the ALJ acknowledged treatment records regularly noting that Franco Sanchez exhibited depressed and anxious mood and affect, at times noting that Franco Sanchez had marginal judgment and insight, and noting early in his treatment with the American Behavioral Clinics that Franco Sanchez demonstrated impaired attention and concentration. R. 26 (citing Exhibits 4F/14, 16; 7F/1, 2, 5, 7, 9; 8F/2–5). The ALJ, however, contrasted those findings with the many mental status exams where Franco Sanchez exhibited good function, including a groomed appearance, good eye contact, normal motor activity, friendly and cooperative behavior, clear speech, fully oriented, no language problems, no memory problems, intact concentration and attention, intact judgment, good insight, coherent thought

12

flow, no problems of thought content, and no hallucinations or delusions. R. 26 (citing Exhibits 4F/14, 16–19; 7F/1, 2, 5–10; 8F/4–6; 10F/4–5).

The ALJ also explained how the medical evidence did not support any of Dr. Winston's and Bortin's specific opinions. *See* R. 27. For example, with respect to the opinions about absenteeism and the need for unscheduled breaks, the ALJ noted that treatment records did not show ongoing partial hospitalization or other treatment that would interfere with a regular work schedule. The ALJ also pointed out that Franco Sanchez generally exhibited good function on examination and that medication was helpful in controlling his symptoms. R. 27 (citing Exhibits 4F/14, 16–19; 7F/1, 2, 5–10; 8F/4–7; 10F/4–5).

Franco Sanchez argues that substantial evidence does not support the ALJ's finding that the opinions of Dr. Winston and Bortin were unpersuasive. He first takes issue with the ALJ's reliance on mental status exams. Franco Sanchez points out that he attended only two counseling sessions each month, generally over the phone, and that he had an ongoing relationship with his psychiatrist and therapist. According to Franco Sanchez, his functioning during those sporadic, time-limited medical appointments was not indicative of how he would function in a work setting. As support, he cites the discussion about supportive situations in the mental health listings and the warnings about the demands of work (i.e., stress) in the social security rulings. *See* ECF No. 11 at 11–12 (citing 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(C)(6)–(D)(3); Social Security Ruling 85-15, Titles II and XVI: Capability to Do Other Work—The Medical-Vocational Rules as a Framework for Evaluating Solely Nonexertional Impairments, 1985 WL 56857, 1985 SSR LEXIS 20 (1985)).

I agree that the ALJ placed too much emphasis on Franco Sanchez's functioning during mental status exams, some of which occurred over the phone. In fact, it appears that

the ALJ discounted the treating providers' opinions exclusively due to Franco Sanchez's performance and appearance during visits with Dr. Winston. The social security regulations require ALJs to consider the objective medical evidence when evaluating the supportability and consistency of a medical opinion. *See* § 404.1520c(c)(1)–(2). And it's true that when a treating physician sits down to fill out a disability report, he may misremember the patient's symptoms or deliberately exaggerate them. *Stephens v. Heckler,* 766 F.2d 284, 289 (7th Cir. 1985) (citation omitted) ("The patients' regular physician may want to do a favor for a friend and client, and so the treating physician may too quickly find disability."). It's therefore fair game, and quite proper, for the ALJ to consider the physician's own records—here, several one-page summaries of mental status visits—in addressing the supportability of the opinion.

Here, however, there are at least two problems with the ALJ's reliance on the mental status exams to discount the providers' opinions. First, to meaningfully discount a medical source's opinion, an ALJ must cite compelling indicia of actual and material inconsistencies between the records and the ultimate opinion, and here there really aren't any. A few examples will suffice. In *Schmidt v. Astrue,* for example, the physician's treatment notes indicated that the claimant's physical examination was "benign," and he "remarked on multiple occasions that her condition was 'pretty good' and 'very good.'" 496 F.3d 833, 842 (7th Cir. 2007). The ALJ was therefore entitled to view the records as contradictory and to discount the physician's later opinion that the claimant was limited to sedentary work. Similarly, in *Pavlicek v. Saul*, the court highlighted the "stark contrast between Dr. Opaneye's June 2017 report and his treatment notes" when those notes indicated essentially normal functioning. 994 F.3d 777, 783 (7th Cir. 2021). And in *Sandefur v. Colvin,* the court observed that "Dr. Abdo's records, which showed . . . no complaints of numbness in Mr. Sandefur's extremities" contrasted

14

sharply with his "opinion that Mr. Sandefur had manipulative limitations caused by neuropathy." No. 3:14-CV-01942-MGG, 2016 WL 6134722, 2016 U.S. Dist. LEXIS 146063, at *22 (N.D. Ind. Oct. 20, 2016). Finally, in *Hinds v. Saul,* the treating physician opined that the claimant suffered from constant lower lumbar pain despite noting, just months earlier, that the claimant's lumbar pain was "not bothering him too much right now." 799 F. App'x 396, 399 (7th Cir. 2020).

The consistent theme in the above examples is that any *non*-physician would be able to discern the inconsistencies between the medical records and the providers' opinions. Here, by contrast, there is nothing in the numerous medical records that necessarily contradicts the providers' own opinions. Although Dr. Winston checked boxes indicating Franco Sanchez was alert or had intact memory and concentration, he also checked boxes indicating anxiety and depression, as well as appetite and weight loss. (The doctor's handwritten notes are largely illegible.) There is no obvious inconsistency between someone who may present as alert or with good memory and someone who has severe limitations, including fatigue, due to depression and anxiety. *Bothwell v. Berryhill,* No. 2:17-CV-427-JEM, 2019 WL 422446, 2019 U.S. Dist. LEXIS 16966, at *11 (N.D. Ind. Feb. 1, 2019) ("The ALJ did not explain why findings that Plaintiff was alert, fully oriented and had normal thought processes during medical examinations are inconsistent with fatigue and a need to take naps.") It's *possible* that there is an inconsistency, but it's not possible for a layman to tease that out of the record. Moreover, the mental status reports also recite the numerous medications Dr. Winston was prescribing, including Xanax, and they describe the changes in dosages to attempt to alleviate the Franco Sanchez's symptoms. In other words, unlike the examples set forth above, nowhere does the provider say that Franco Sanchez's condition was substantially improving or that he

15

would be able to focus and stay on-task for a full workday, in contradiction of his January 2020 opinion. "Simply put, no medical provider mentioned any inconsistency between complaining of chronic fatigue and appearing alert and pleasant during a visit to the doctor." *Lanzi-Bland v. Berryhill,* No. 16 C 8856, 2017 WL 4797529, 2017 U.S. Dist. LEXIS 176140, at *21 (N.D. Ill. Oct. 24, 2017).

A second and related problem is that courts have recognized that judges, including ALJs, must proceed with extreme caution before drawing any inferences from a patient's demeanor during an exam with a trusted provider in a controlled and predictable setting. "As many courts have noted, the fact that a claimant is friendly and alert during a mental status exam is not a basis – at least without more discussion by the ALJ – for finding that he or she is less limited than the claimant alleges." *William A. v. Saul,* No. 18 C 2098, 2019 WL 3857874, 2019 U.S. Dist. LEXIS 138813, at *37 (N.D. Ill. Aug. 16, 2019). In *Kangail v. Barnhart,* for example, the court found no contradiction when providers observed that the claimant "was behaving pretty normally during her office visits," and yet concluded that her mental illness was severe. 454 F.3d 627, 629 (7th Cir. 2006). This is partly because "a person who suffers from a mental illness will have better days and worse days, so a snapshot of any single moment says little about her overall condition." *Punzio v. Astrue,* 630 F.3d 704, 710 (7th Cir. 2011) (citations omitted). It's also partly due to the fact that a person with mental illness will often feel most comfortable in the presence of his therapist or psychiatrist. "Courts have further rejected a claimant's demeanor and eye-contact in therapy sessions as reasons for questioning the claimant's alleged psychological restrictions." *Carolyn S. v. Saul,* No. 19 C 385, 2020 WL 231085, 2020 U.S. Dist. LEXIS 6583, at *28 (N.D. Ill. Jan. 15, 2020) (citing *Kangail*, 454 F.3d at 629; *Voorhees v. Colvin*, 215 F. Supp. 3d 358, 385 (M.D. Pa. 2015)).

Here, the ALJ discounted the treating providers' opinions almost exclusively due to the providers' own records, which indicated things (in checkbox form) like a groomed appearance, alertness, and adequate concentration. *See* R. 26–27 ("Treatment records consistently note he is alert and fully oriented"; "Treatment records regularly note intact attention and concentration"; "treatment records consistently note the claimant is alert and fully oriented.") Dr. Winston had also opined that Franco Sanchez's medications would have a sedative effect, and the ALJ (implicitly) rejected that conclusion because Franco Sanchez appeared alert at office visits. However, "just because Plaintiff was alert during his doctors' visits does not mean that he did not experience any side-effects from his medications." *John P. v. Saul,* No. 2:19CV0004, 2019 WL 4072118, 2019 U.S. Dist. LEXIS 147293, at *32 (N.D. Ind. Aug. 28, 2019) (citation omitted). The ALJ also relied on the same treatment notes to undermine the opinion of Dr. Pushkash. "The opinion is not persuasive. . . . A severe limitation in the ability to concentrate and persist on tasks is not supported by treatment records, which show treatment providers regularly noted intact attention and concentration, and unimpaired cognition and thought process." R. 25.

In sum, the ALJ appears to have relied exclusively on Franco Sanchez's performance during checkups with Dr. Winston to discount the (contemporaneous) opinion of Dr. Winston himself, as well as that of Bortin, Franco Sanchez's therapist. Both providers found that Franco Sanchez was suffering not from run-of-the-mill anxiety and depression, but anxiety and depression so severe that he would miss more than four days of work per month and would need several breaks per day. The ALJ also cited those same records in finding the consulting psychologist's opinion wholly unpersuasive. The records cited by the ALJ are not actually contradictory, however, and, even if they were, the ALJ placed too much emphasis

17

on Franco Sanchez's alertness and concentration during short visits with (mostly) trusted providers. This is particularly true when the ALJ used those records to discount the opinion of not one, but three, providers who actually spent time with Franco Sanchez. *Grzegorski v. Saul,* No. 19-CV-1661, 2020 WL 5047555, 2020 U.S. Dist. LEXIS 155646, at *20 (E.D. Wis. Aug. 26, 2020) ("[A]ny inference from the fact that [the claimant] is sometimes able to appear with 'normal behavior, normal mood, appropriate demeanor,' etc. . . . during her medical appointments is limited, given that mental health patients are often much more comfortable with familiar treatment providers than they would be in a work setting.").

Finally, Franco Sanchez takes issue with the ALJ's reasoning for rejecting Dr. Winston's and Bortin's opinions about absenteeism and the need for unscheduled breaks. The ALJ concluded that Franco Sanchez would not need to be absent four or more times per month, nor would he need to take a large number of breaks during the day, because there was no evidence of a need for frequent treatment or hospital stays. R. 27. Franco Sanchez correctly points out that Dr. Winston and Bortin said he'd have absenteeism problems due to the debilitating effects of his depression and anxiety symptoms, *see* R. 324, 369, *not* because he'd need to be hospitalized or need frequent treatment. Although the ALJ did provide other reasons, including reliance on the mental status exams, these are essentially unsupportable for the reasons explained above.[3]

---

[3] The ALJ also thought that Franco Sanchez improved with medication. According to Franco Sanchez, the records cited by the ALJ clearly show that his negative clinical findings persisted during his treatment with the American Behavioral Clinics; they did not, as the ALJ concluded, decrease over time. That's somewhat true. The record shows an overall decrease in some findings, as Franco Sanchez's motor activity went from "hypoactive" to "calm," his speech from "slow" to "fluent," his affect from "blunt" to "appropriate," and his concentration and attention from "impaired" to "intact." *See, e.g.,* R. 346, 348–51, 382, 385–87, 389–90, 397–401, 445. However, other findings—most notably Franco Sanchez's depressed and anxious mood—did remain mostly consistent despite medications and counseling.

18

## CONCLUSION

For all the foregoing reasons, I find that Franco Sanchez has demonstrated that the ALJ committed reversible error in evaluating the opinions of his psychiatrist and psychotherapist. Because the record does not reveal any other conceivable reasons for rejecting the treatment providers' opinions, and because the vocational expert testified that such opinions (if adopted) would be work preclusive, there is no point to remanding the case for further proceedings in front of the Commissioner. Accordingly, the court **REVERSES** the Commissioner's decision and **REMANDS** the matter under sentence four of § 405(g) with instructions that the plaintiff's application for disability benefits be granted. *See Kaminski v. Berryhill*, 894 F.3d 870, 875–76 (7th Cir. 2018); *Phillips v. Colvin,* 171 F. Supp. 3d 819, 830 (E.D. Wis. 2016). The clerk of court shall enter judgment accordingly.

**SO ORDERED** this 13th day of January, 2023.

STEPHEN C. DRIES
United States Magistrate Judge

Case 2:21-cv-01442-SCD   Filed 01/13/23   Page 19 of 19   Document 17